Our final case is Phan v. Mylan. We all have to recuse ourselves. When you're ready, Mr. Pappas.  The issue presented by this appeal, as we set forth in our brief, is whether the district court clearly erred in concluding that none of the lactose cores in Mylan's product were surrounded by budesonide and ethyl cellulose. Mr. Pappas, isn't this a three-component claim? Claim one? Yes, it has three components, yes. Isn't it clear that there wasn't adequate evidence to show that the Mylan product was a two-component product? No, Your Honor. I think that our view of the case is that, since it is a core comprising, that while the claim may spell out three components, they really have three components as well. They have a lactose core surrounded by budesonide and ethyl cellulose, and the third piece is the enteric coating that surrounds the entire pellet. Is that a question of fact? Your Honor, it isn't. Well, the only issue in this appeal is whether or not the core is surrounded by budesonide and ethyl cellulose. That's the only issue the parties disagree on. The record's clear that they have the rest of the evidence. But you just explained that the trial judge, or you were explaining why some people viewed it and trial judge it as a two-part. Their invention over their product is two-part. You're saying it's three-part. It is three-part. Is that a question of fact? Well, it's a question of fact based on the evidence, Your Honor. Yeah, of course. But, of course, in fact, that's why we're here. The question here is whether the determination of the trial judge was clearly erroneous or not. That's correct, Your Honor. That is the test, and what we're asking the court to do is to review carefully the evidence and also the absence of a truly probative evidence. Well, the trial court's going to give a lot. We're into facts now, and that's clear. Correct. The trial court gives a lot of credibility deference to Dr. Elder. How do we get past that? Your Honor, because, simply put, as this court has found, the district court can't cloak the application of an erroneous legal standard under the guise of credibility determination. What is the erroneous legal standard here? Well, in this case, there was simply the court was incorrect in finding that there was not a complete coding around the v-design. Well, wait a minute. We just got done agreeing that was a question of fact, not an erroneous legal standard. It is what my point is, Your Honor. Did I misunderstand? No, but the ultimate conclusion that one weighs the credibility of one witness over another doesn't obviate the need to examine the underlying facts. Right, not the legal standard. Right, not the legal standard, the facts. Okay, so that quote of yours isn't really quite on point. Correct. Okay, that's all. I just want to understand what your argument is at this point. Well, the trial judge heard testimony from two experts concerning what the facts were and made a judgment. Right? So there's no legal standard here. No, it's a factual, Your Honor, the question in this case, we believe, is whether or not the judge made clear error on his factual determinations. And our point is that... And he had two experts. One expert said it's... Two parts. The other expert said it's three parts. He sat there for three days, if I remember the record correctly, and listened to them. And he said, I believe you. I believe it's two parts. What are we to do? Your Honor, by examining the evidence, it becomes clear that it is, in fact, the accused product has three parts to it. Your view is we can re-weigh the evidence and come out with our own conclusion. Your Honor, I would prefer to state it this way. I don't think it's necessarily a question of weighing the evidence in this case. I think it's a question of examining the evidence. Well, okay. We examine. There's a new process. There's this lottery ball sort of machine that coats these granules. That's correct. But how would we possibly come to the conclusion that each of those granules is completely surrounded by a coating, which is required by the claim construction, and that's not challenged? How would we possibly contest that? The answer is, Your Honor, by reviewing the evidence, which is uniformly consistent with the conclusion that the core is surrounded by budesonide and ethyl cellulose and inconsistent with Dr. Hilder's opinion. Second of all, the lactose core. The collection of all those little mini capsules that they make is completely surrounded. No. Each one of them is completely surrounded. Little granules. Little granules. Exactly. Each one of them is completely surrounded. Right. They start out with lactose, which is a substrate, because you have to have something to attach the drug and the membrane. Dr. Hilder said that's not right. Well, he didn't say that's not right. He agreed that if you're going to have a controlled release product, you have to have ethyl cellulose and budesonide. Budesonide is the medicine that treats the Crohn's disease. And ethyl cellulose is the substance that makes sure that it's gradually in sustained release in the small intestine and the enteric coating protects it from dissolving in the stomach where we don't want it to get to. So there's really no disagreement among the experts about the purpose of the chemicals. The debate is really very straightforward. And this is the only issue on which the parties disagree. Was the core, each of their cores, surrounded by budesonide and ethyl cellulose, or was it what Dr. Hilder called a binder bridge, which is a lactose core with two prongs emanating from each side that he says contains the ethyl cellulose and budesonide. Now, what we're advocating, and we believe it's this court's obligation, is to review that evidence to determine if Judge Sleeve's judgment that relied on Dr. Hilder's testimony is supported by the evidence. Is there sufficient evidence to support that? Put another way, it's never enough in a court of law for an expert to take a stand and say, this is my opinion, I'm qualified, this is my opinion. Dr. Hilder, did you do any tests? No. Did you look at the product? No. Did you visit the plant where the product was made on controverted evidence? No. Did you handle the product? No. Did you explore or conduct any scientific tests, microscopic or otherwise, to determine if these things called binder bridges existed? The answer is no. In contrast, you had Dr. Davies, who had the product, put it through dissolution tests, studied under the microscope, then did spectroscopy to determine what the contents were, and gave evidence about how the product was actually manufactured. And our bottom line is this, I don't believe you can then come before the appellate court and hide behind a total lack of evidence by the defendant in this case, and say Judge Sleek made a credibility determination. The precise reason you have appellate review is for you to look below you. Dr. Hilder and Milan attacked Davies' dissolution test, saying that's not an accurate test. What would your response be to that? Twofold. One is, Dr. Davies established that it was an accepted test, and he's a distinguished expert, by which you determine whether or not there was something that surrounded the lactose pellet. What he found was, and now we're talking about the evidence, and I understand this appeal requires the court to sift the evidence, but with due respect, that's exactly why we have appellate courts, and that's why we have to come here when what happens at the district court took place. Someone has to look at the underlying evidence to see if the judge got it right. So Judge Rader, the Chief Judge Rader, he found? No, if the judge got it clearly wrong. All right, clearly wrong. Fair enough. But I would say clearly wrong is demonstrated by the fact that there was no test and no analysis done by Dr. Hilder. He applied his general knowledge to material he saw in the abbreviated new drug application. You make a good point, and it's a point that troubled me a little bit about Dr. Hilder's lack of actual hands-on experience. But what I get from this is that Mylan rolled the dice on this one, and they said, rather than have all these experts plowing around through what we do, we're going to wait and see if you can prove your case. And the trial judge said, you didn't. And that's a roll of the dice, and they won at the trial. But if that determination... State it otherwise, you have the burden of proof. We do. By 50.1%, or just barely over 50, and he proved the case. And he said you got maybe to 49, but you didn't quite get to 51. And I think the next question then the court has to ask is, how, on what basis, scientifically, did Judge Sleet reach that determination? What evidence did he have? He listened to your expert, and he said, that's not really persuasive. That's not preponderant evidence. Now, he may be wrong, but whether he's right or wrong is not the question before us. The question before us is, is he so clearly wrong that we ask to reverse him? Let me give you two examples. First of all, Your Honors, if you'll look at A1127, there is a Myla Anda in which they show you the core pellet. And Dr. Davies very clearly testified that that core pellet shows as Myla represented it to be. The lactose cores surrounded by budesonide and ethyl cellulose. Now, nowhere in that Myla Anda is there anything called the binder bridge. So it's coded. You can search Judge Sleet's opinion. He doesn't even address this. He ignores it. Now, I'm not saying a trial judge has to cite every piece of evidence, but when he has probative, competent evidence in the defendant's own abbreviated new drug application, which is the basis for FDA approval, that shows a coded core. All right? Now, let me contrast this for you. Look at 1050. This is the picture of the binder bridge. Now, judges, you can look at that until the cows come home. And that binder bridge doesn't look anything, not a scintilla similarity to what they told the FDA. You can search the entire Anda. The words binder bridge never appear. Remember, this was a trial where both experts are paid. Dr. Davies' testimony is consistent with the disclosures made by Myla to the FDA. At the end, it does mention granulation, which occurs with a granulator. It can, if you have what's called wet granulation, as opposed to the dry fluid bed that was used to coat the particles. And so what happened at the trial? Dr. Davies said, okay, this machine can be used to do both. I will do scientific tests to determine which that it did. Dr. Elder did nothing. Did nothing. So what you have is expert testimony where he says, I think they're binder bridges. Based on what, Dr. Elder? Well, I didn't do any tests. Did you see one? No. Did you look for one under microscope? Can't see it. Did you do any tests that would show you they were binder bridges? Nope. Then when he looks at Dr. Davies' films, which Dr. Davies testifies, uncontroverted, that they were consistent with the coatings, you couldn't lift them otherwise, Elder just says, I think they're binder bridges. And you know what I think it is? It's an agglomeration of pasta. He did no tests for the pasta. He cited no scientific literature for the proposition that binder bridges agglomerate into pasta. And he has no support for it whatsoever. And next, Your Honors, I would ask you, there's also evidence, if you look at the 1138, this is the process. And what you'll see in the first box is granulating suspension number one, which is budesonide. The first box, Your Honor. The first box. Right. You'll see it says, with continuous agitation, add part one budesonide. Okay, now you know you have budesonide. Then vessel two has ethylcellulose suspension. Now you have ethylcellulose suspension. The next box down says, add the ethylcellulose suspension to the granulating suspension. So now you have the ethylcellulose and the budesonide. Now what happens? According to their own document. The little square then says, add part two lactose monohydrate. Lactose. That's the sugar core. And then it says, spray with the granulating suspension. What is the granulating suspension? Ethylcellulose and budesonide. It doesn't say spray partially. Spray a little bit. Spray 10%. It says spray in its entirety. Dr. Elder never explains. And then the question is, do we then have a layer surrounding said core? Right. Exactly. And what Dr. Davies said is, I saw the picture of their pellet. They show me a core surrounded by ethylcellulose and budesonide. I looked at their process for manufacturing. And gentlemen, please keep in mind, this is the Mylan document, which supposedly is true when they give it to the FDA. Saying that's how it's prepared and he explains the process. And then he does what any self-respecting scientist who deserves credibility in this court would do. He tests to see, I'm going to dissolve the product and see if the results I get are consistent with binder bridges or is it consistent with a coated lactose core. He finds that it's consistent with the lactose core. And the final point, Your Honor, because I see I'm into my rebuttal time, is the disintegrant. Mylan Zone's test showed that in the first 50 minutes there was no dissolution of the lactose. Dr. Davies said, if these were binder bridges, in other words, the entire coating disappears, gentlemen, when it leaves the stomach. So now you have all these binder bridges out there. Little lactose cores with ethylcellulose and budesonide would have dissolved immediately. But they needed a disintegrant. Why do you need a disintegrant? Because there's a coating around the core and that's how you begin to release the drug. Thank you, Mr. Pappas. And after you've consumed all your time, what we'll do is we'll give you 2 minutes back. Would you give Ms. Stafford an extra 3 minutes and that'll keep things exactly even if she needs to use that time. Ms. Stafford. Thanks, Your Honor. May it please the Court. My name is Nicole Stafford and I represent the Athol-E Mylan Pharmaceuticals, Inc. I would like to just first start off by contesting something that my colleague said. I disagreed with quite a bit of it, but I'd like to at least start off by his characterization of Dr. Elders having done nothing. We totally disagree with that. Dr. Elders had 24 years of experience with the exact equipment and compositions that are used in the preparation of Mylan Xanda. He studied Mylan Xanda. He also studied the 30B6 testimony of Dr. Dave Wargo, who is in charge of the R&D for this product. Moreover, he analyzed Dr. Davey's expert reports as well as the experimental test protocol and the exact same results. He reached a different conclusion as to what those results showed. The trial court believed Dr. Elders' view and did not believe that Dr. Davey's or AstraZeneca met their burden of proof. This Court's position is not to reweigh those facts. And so we believe that this is a straightforward case where the patentee appellant, AstraZeneca, failed to meet its burden of proving infringement of its patent at trial. That's the only issue here. Well, you say we shouldn't review the facts. How do we review the determination of the trial court who made a judgment of credibility in favor of Dr. Elder rather than the other experts? Well, the Supreme Court in Anderson and this Court in Daft and other cases have held that such credibility determinations are difficult if not virtually unreviewable. Now, the appropriate standard of review in this case is clear error. Therefore, this Court must have a clear and definite conviction that an error was made. Well, the only way we're going to get that is by reviewing the facts. So we have to review the facts, don't we? I believe that it's appropriate for this Court to look at the facts and see if there is some evidence to support Judge Cleek's determination of non-infringement. And we think that there is. This is not substantial evidence. This is not an administrative law problem. There has to be clear error. So we need to go pretty far into these facts in order to get where I assume you think we should go, which is to determine whether there was clear error on the part of the trial judge. We think it's appropriate for the Court to look at the facts. We don't think it's appropriate for the appellate court to reweigh the facts. So even if this Court were to decide that if they were the trial judge, they would have come out with a different conclusion. That's not reversal. That's not clear error. Clear error is a firm and definite conviction that a mistake was made. And it's more than just the appellate court saying, you know, I would have decided this differently. And that was what the Supreme Court said in Anderson. Just because the appellate court would have decided the case differently on many of the undisputed facts doesn't mean that there was clear error in the trial court's determination. Ms. Stafford, looking at the facts now and the process chart that Mr. Pappas just showed us, we have a granulator. I call it this lottery ball coder. How would you put your granules through that without coding them completely? Well, as Dr. Elder and Dr. Davies testified, most of the testimony about the manufacturing process actually came in through Dr. Elder. The way that you configure your fluid bed granulator has a lot to do with the results that you get. And so, in fact, if you're going to try to coat these particles completely, you don't use a top spray fluid bed granulator as Mylan uses it. The most common way to use a fluid bed granulator is to insert something called a Worcester, columnar Worcester insert. And there are several different factors and parameters that are very important to determine whether you're going to get a coating or whether you're going to get a binder bridge or something in between. Where does the milling operation fit in that description? That occurs after, and that's a very good point. Because we believe that not only does the ANDA support that we have a two-part component, that even if, hypothetically, one were to assume, as we asked our expert to do at trial, that a coating was formed in the granulation, one still has to take in the subsequent steps. So after you have a granulation, you still have a milling step where... Could you come back to the granulator and give me something that I can understand? You've got this spray and the ball's bouncing around. How does that spray not cover the ball, the granule, completely? Well, because what you have is you have the particles are being blown up from the bottom. They're fluidized. They're moving in a totally random fashion. And then from the top, you have little droplets or bits of this suspension, your granulating suspension. And every time that the granulating suspension hits a little lactose bead, or actually it's fairly big compared to the droplet size, and then that ball will hit another ball. And it'll, in fact, form a bridge and form an agglomerate that will build up multiple and very large numbers of lactose particles altogether. It's actually easier for me to envision that what you have is like little bits of glue coming in. You've got one ball hitting the droplet glue and then hitting another ball. As opposed to, it's much more difficult if you want to use these types of systems to actually fully coat and completely surround any of those balls. Well, this is not a process claim, right? No, it's not. It's a product claim. It's a composition of matter claim. Right. And clearly it requires three components. What other, and you maintain your product has two components. Yes. One is obviously the enteric coating. Yes. And you've got a bunch of other materials. Are they all in a central core? Yes. And so the way that the and describes are... What is in the central core? The steroid? The central core... The lactose? Yes. So the central core is made up of granules that are formed from agglomerates of lactose that are held together by little binder bridges of ethyl cellulose and butadenide. And to that is added extra granularly disintegrate, lubricant, and I believe some other excipients that are used in the tabling process. And that mixture is then compressed under great pressures to form a tablet. That tablet is homogeneous. It's uniform. It is not a composition of a bunch of little coated cores as AstraZeneca would have. And then that tablet is coated with an enteric coat. So you're saying that whatever it is that second coating that is in their claim in your case is actually incorporated into the little tablets. Is that what you're saying? Yes. We would probably describe it differently in that what we would say is that we have a tablet that achieves controlled release by using a mixture or a gamish or if you want to call it a matrix of little binder bridges that have been compressed together with lactose. But back to your question earlier that I don't believe I answered, is that after you have this granulation where you've basically formed a glomerulus of various different sizes of lactose held together with binder bridges, that is not subject to an enteric coating. That goes through two additional process steps or at least two, but two that are relevant to this case. And the first one is that it's milled. And so it's actually ground up at a speed of about 700 rpm. There's two blades on this device. So you're talking 1400 passes per minute. And it's basically cut and screwed through this screen to cut the size. And Dr. Elder testified that in his view that even if you were to arguably have a coating after the granulation, that this milling process, kind of like a pepper mill is a co-mill, that this would in fact cut and break any such coatings. So what's missing in the claim from your product? B? Layer surrounding said core. Layer surrounding. Yes, Your Honor. And so after that step, there's also a compression step. And the compression step takes a mixture of the milled granulate and other components and compresses it together into a tablet. We'd understand from the record that your people deliberately went about trying to figure out how to manufacture this product, designing around the claim. I get that from somewhere in the record. Is that a mistaken impression? I'm not sure if the record went into the intentions of Milan in designing their product. Milan does believe that they have a unique formulation. They actually have patent applications to their own formulation. They believe that theirs works in a different way. It uses different components. So for example, all of the examples in the patent in AstraZeneca's product uses traditional nonpareil seeds. These things are not crushable. You use them in a very more traditional coating process. It applies a uniform coating to each one. And then each one of those nonpareil seeds that has been coated with your ethyl cellulose budesonide layer is then individually coated with an enteric coat. We don't do that. What we do to control the release of our product is we use these binder bridges. And so that once you go through the stomach, the enteric coat dissolves away. And then the tablet disintegrates and it basically sprays all these little binder bridges into the intestines. And then it's those binder bridges that control the release of the drugs. And you've looked in the intestines to determine this? I have not. You're a scientist. Our client has looked at this in different ways to determine that, yes sir. Are you being held off the market because of the 30 month period? No. We launched at risk because it was after the 30 month period. And that's one of the reasons that we have wanted to have a speedy appeal. We filed our appeal briefs early and we had opposed some delays in the oral argument because our client is at risk at this point. And so we did want a speedy appeal. So we're not being held off the market currently. And one thing that I think is very important to point out is that we didn't have the burden of proof on this appeal. AstraZeneca did. The trial court determined that they didn't meet that burden of proof. And even if your honors were to disbelieve everything Dr. Elder said and find that it wasn't supported by the evidence, which we think should not happen, we still have documentary evidence that's sufficient to support Judge Schlieff's determination and that's the ANDA itself. Now although counsel for AstraZeneca points to certain portions of the ANDA, I challenge you to go look at those portions and find any description of an intermediate layer surrounding a lactose core. It isn't there because that's not Myelin's product. The district court correctly found that Myelin's ANDA, on its face, even at anything Dr. Elder says, but on its face, describes a two-component composition and not the claimed three-element composition that's required by their claims. Now this court has said, and Abbott v. Torfarm and other cases, that the Myelin may be the best evidence of infringement because the FDA has certain requirements and because under 271E2 that you're looking at, you want to determine whether the product that is likely to be marketed or would be marketed should the ANDA get approval is what would infringe or not infringe. And so the ANDA, if it directly addresses an issue of direct infringement, may be the best evidence. Now on Abbott v. Torfarm,  is it dispositive? No. Because, for example, it may be possible for a party to present evidence that would refute or clarify the information that's present in the ANDA in a way that's material. However, this court recognized that that would be highly unlikely. I mean, if you think of it the other way around, the ANDA is an admission of bioequivalence which is often evidence of infringement. It can be. But in this case, the ANDA describes our product and it describes the manufacturing process to reach that product. And clearly, following the description in the ANDA, we do not have a layer surrounding said core. Now, one final point that I would like to disagree with, which is, I believe Mr. Paffa said at the outset of his argument that the only element that's an issue is the layer surrounding said core. That's the only element in issue with this appeal because the district court did not find that every other element was met. The district court only found that the layer surrounding said core element was not met. The district court did not find that our product has a core consisting of a nonpareil seed. Now, your ANDA does say that you have a coating system. The coating system doesn't coat? I believe when it says coating system, it's talking about the trade name of the ethyl cellulose, which is Aquacoat. If you look at the product literature that is provided for Aquacoat, which is cited in appellate... Can you show us that in your ANDA? Where it refers to it as a coating system? Yes. I'm looking at the page... When I'm looking at the page, at page A1127, which is the page that was pointed to by appellate counsel during their argument, I don't see any description there of a coating or coating system. I was referring to a page which I don't have off the top of my head, but it's in their... I believe their original brief where they talk about Aquacoat. That's the trade name for the ethyl cellulose that we use. It's described in FMC's product literature as a potential coating system. I believe that is maybe somewhere around pages A1091 through A1101. It does describe the fact that you can use ethyl cellulose in coating applications. What's also clear, it is well known in the prior art and is also disclosed in this very same application, is that you can also use ethyl cellulose in granulations where it serves as a binder. Now, counsel at trial and here today has made fun of this term binder bridge, implying that this is something that our expert made up. That's not true. The term binder bridge actually first appeared in this litigation in Dr. Davey's initial expert report. Let me help you. I'm sorry. You're supposed to know this record, not me. Page 1129, second line from the bottom. ECD coating system. That's right in the end. Plasticizer.  In the aqua coat, ECD coating system. Blah blah blah. And this is the bottom of page 1129? Yes. I believe that was just referring to the actual trade name of the product. We don't believe that there is, as the district court found, there is never a description of the ethyl cellulose. Your coating system doesn't coat. We don't think it does. We think it forms binder bridges. Yes, sir. Moreover, I guess there's another important question which should be raised, is that the agreed upon construction is not just that you have a coating, but is that you have a coating that completely encloses on all sides a core. So even if you were to buy that some of the aqua coat does some coating, there is clearly no evidence that any lactose particle, much less a core of lactose particles, are completely enclosed on all sides by the coating. And in fact, we believe that the actual results from Dr. Davies' testing, which I believe the optical micrographs are present in the appendix, shows not what you would expect if you had completely coated cores. As Remington describes, ethyl cellulose is not water-soluble. The way it acts to release drugs or release things that are contained within it is when you get to a point like, for example, the enteric coating dissolves, water will permeate through that coating, dissolve things such as the budesonide or, if you've got a completely coated core, the lactose, and then allow for those components to basically come back out. Well, if you had completely coated cores, what you would expect to find in the optical micrograph are basically little, either empty vesicles or little, what look like water balloons. You wouldn't expect to find this gamish of all different sizes, shapes. It looks more like a spiderweb. So, I don't know if that answers your question, Your Honor. Your coating system doesn't coat. That's what you're saying. We don't believe that we have a layer surrounding said core. And just the fact that we use something called aqua coat that is described in its literature as a coating system, we don't believe that that establishes infringement either. Now, if the court had gone, if the district court had gone the other way, it might be difficult for us to establish clear error if we were in their shoes, but we aren't. We established to the trial courts, you know, persuasion that, in fact, there is no layer surrounding said core. You want us to think of the coat that you put on sort of like an overcoat that doesn't cover the lower legs. Well, possibly, although we think it's much smaller than that. Dr. Davies had admitted that if we had a conventional granulation that it would form binder bridges. Dr. Davies pointed to nothing that was unconventional about our granulation process that would lead one to believe that you actually formed a coating, and therefore we believe that binder bridges was formed. Just to the last point that I think I haven't addressed, which is the disintegrant. The fact that our product needs a disintegrant is not evidence that any lactose particles are completely coated. Dr. Elder testified that all the lactose particles themselves are quite readily soluble in water when you compress and compact them because they're very friable, which not only leads to... Final thoughts, Ms. Stafford? What, Your Honor? The red light. I'm sorry. What do you suppose that means? Okay, I'm sorry. Do you have a final thought? Yes. It means you're coated. We believe that disintegrant is not probative evidence, that that's commonly used in numerous tablets that are formed with granulations. It's used to disintegrate the tablet. Moreover, it's outside. It's extra granular, and therefore as it swells to rapidly push apart stuff, it couldn't disrupt any coating that was present. Thank you. Thank you. Could you give Mr. Pappas three minutes, and that'll keep the timing. Your Honor, first of all, I want to make... read one sentence from the Anderson case, the Supreme Court case, because I think it puts this colloquy in perspective. The court said that when reviewing the evidence, notwithstanding what they may think of the expert, quote, documents or objective evidence may contradict the witness's story, or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it, close quote. So to one of the gentleman's questions, it is the job of this court to weigh the evidence to see if there's any actual basis for the evidence that was marshaled against us. What gentleman are you referring to? All of you. I thought I meant it plural. I thought I said men, Judge Laurie. Let me take on one issue which I think is important about coding based on some of the questions. You'll know from 1138, as I pointed you to before, and time is short so I don't need to go through the entire part, but there's no question that the budesonide and ethyl cellulose is then coded, all right? And I think it was you, Chief Judge Rader, that pointed out that aqua coat is called out. And I believe Ms. Stafford's reaction was, well, we're not sure that's what was used or what was used to coat. Well, now let me direct your attention to appendix 1132.  granulating suspension, now remember part one granulating suspension is now what has ultimately is mixed together before it's coded. In appendix 1132, you will see on the second line ethyl cellulose aqueous dispersion aqua coat, ECD. They use the very coating that is advertised by aqua coat to coat beads by FMC. I understood Ms. Stafford to say that they use the product in their manufacturing process. Right. But they don't use it to coat. To coat. That's what Ms. Stafford said. Right. And aqua coat is precisely the product they use. And the question isn't whether there's material in there with the name coat, but whether there is a layer surrounding. And that is the language of the claim. Right. And to that point, Judge Lori, is that what 1138 makes clear, which is their own process drawing, is that once they have mixed the budesonide and the ethyl cellulose, they then coat it with the ethyl cellulose by spraying it on. So now what you have is you have the lactose core surrounded by ethyl cellulose and budesonide, which has been sprayed on, the second part. And then on the second column of process, on 1138, the middle box, they then apply the third layer, which is an interic coating. Now as far as... Final thought. Final thought it is. You examine the evidence. You have affirmative evidence from Dr. Davies that's consistent with the ANDA and was based on actual scientific testing that there was a coating completely surrounding the core. On the other hand, on the other side, you have Dr. Elder, who did no tests, no analysis, no study of the actual product. That is not sufficient to defeat the evidence which we put before you. Thank you, Mr. Patterson. Thank you. The honor report is adjourned until tomorrow morning at 10 a.m. Thank you.